Filed 12/21/21  In re E.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re E.W., a Person Coming Under the Juvenile Court Law. | |
| | D079326 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. NJ15691) |
| Plaintiff and Respondent, | |
| v. | |
| K.W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

At the contested six-month review hearing in this dependency case, the juvenile court found it would be detrimental to return baby E.W. to the care of the parents, found the San Diego County Health and Human Services Agency (Agency) had provided reasonable reunification services to the parents, and ordered additional services for the parents. K.W. (Mother) appeals those orders.[1] Mother's sole contention is that there was no substantial evidence to support the court's finding that the Agency provided her with reasonable services because the Agency was unable to locate an out-of-state therapist for her by the contested six-month review hearing. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Detention, Jurisdiction and Disposition*

E.W. was one month old when she was discovered to have two clavicle fractures and a retinal hemorrhage. A child abuse medical expert determined the right clavicle fracture was healing and could have occurred during childbirth. The expert concluded, however, that the "force required to cause [the left clavicle] fracture . . . would be outside the realm of normal care [and] handling and consistent with physical abuse." (Boldface omitted.) Mother's explanation that the baby fell from a bouncy chair onto her face one and a half weeks earlier "cannot explain" the injury. The expert also determined the baby's eye injury, although "seemingly minor," is considered a "sentinel injury" in a non-mobile infant and a harbinger for more severe

_____

[1]    T.W. (Father) has not challenged the juvenile court's orders made at the six-month review hearing. We discuss Father only as necessary to address Mother's appeal.

abuse in the future. (Boldface omitted.) The retinal hemorrhage, she opined, could be the result of direct impact to the eye globe, but could also be related to events that cause a back flow of blood into the head and neck, such as suffocation, strangulation, or smothering. Based on her findings, the expert believed that returning the baby to the environment in which she sustained the injuries would place her at "extreme risk of ongoing and potentially escalating forms of maltreatment to include the possibility of death."

The Agency detained E.W. on October 29, 2020 and filed a petition the next day under Welfare and Institutions Code[2] section 300, subdivision (a), alleging there was substantial risk she would suffer serious physical harm inflicted non-accidentally. Pursuant to section 355.1,[3] the petition alleged E.W. had suffered injuries which would not ordinarily be sustained except as a result of the unreasonable acts of the child's parents.

At the detention hearing on November 2, 2020, the juvenile court found there was a substantial danger to the physical and emotional health of E.W. and that continued care in the parents' home was contrary to E.W.'s welfare, based on the medical opinion that the injuries were inflicted non-accidentally. The court ordered E.W. detained in an approved home of non-relative extended family members and ordered liberal supervised visits for the

---

[2]    Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3]    Section 355.1, subdivision (a) provides, in relevant part: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."

parents.  The court further ordered the Agency to provide the parents with voluntary services, specifically parenting classes and counseling.

The same day, after the detention hearing, an Agency social worker submitted referrals for both parents to receive parenting classes and child abuse group therapy.  On November 16, 2020, the social worker was informed that both parents had been assigned child abuse therapists and could begin child abuse group therapy.  The parents also began participating in supervised visits with E.W. three times a week along with daily phone calls and text messages.

At a December 21, 2020 pretrial status conference, Mother's attorney requested the juvenile court reconsider its detention order because the parents were moving out of state to reside in maternal grandmother's home. Father had been discharged from the Marines and enlisted in the Army and was waiting to hear where he would be stationed.  Mother requested that E.W. be detained with the parents at maternal grandmother's home under a safety plan, "[o]therwise, the parents are going to be about a thousand miles away and unable to have in-person visitation."  Father joined Mother's request, while both counsel for the Agency and for E.W. objected to Mother's request.  The court denied the parents' request without prejudice, authorized an evaluation of maternal grandmother's home pursuant to an Interstate Compact on the Protection of Children (ICPC), and gave the Agency discretion to place the child with the parents in maternal grandmother's home "if the ICPC is approved" and E.W.'s attorney agreed.  The court noted the ICPC was "going to take some time."  The parents left California on December 24, 2020.  E.W. remained in San Diego with the non-relative extended family members.

4

On January 5, 2021, an Agency social worker met with Mother by video conference. Mother reported she was participating in telehealth sessions for in-home parenting skills and only had a parent-child interaction component remaining. However, Mother had not enrolled in her child abuse group therapy, because she had not submitted the intake paperwork to her therapist to begin group therapy. Mother explained she received the paperwork by email but did not have a way to print them out. When the social worker offered to print and mail a hard copy of the paperwork to Mother if she would forward the email to her, Mother declined and stated: " 'Well, now that we are at my mom's she has a printer. I could have printed it this entire time.' " Mother was also having supervised video visits with E.W. three times per week.

The Agency social worker also met with Father by video conference the same day. He was nearly finished with the parenting class as well and had already participated in three child abuse group sessions since starting the service on December 22, 2020. He told the social worker he believed he could continue those sessions after his move.

On January 8, 2021, at the contested adjudication and disposition hearing, the Agency amended the petition to omit reference to the eye injury and to allege E.W. came under the juvenile court's jurisdiction pursuant to section 300, subdivision (b)(1), because she suffered serious physical harm to her left clavicle as a result of the parents' failure to supervise or protect her adequately. The court dismissed the allegation under section 300, subdivision (a), and found the amended petition true by clear and convincing evidence. The court removed custody from the parents, ordered the continued placement of the child with the non-relative extended family

members, and reunification services for the parents. The court set the six-month review hearing.

## II.

### *Six-Month Review Hearing*

At the contested six-month review hearing on August 6, 2021, the juvenile court heard testimony from social worker E. Warner and received into evidence the Agency's various reports. No affirmative evidence was introduced by Mother or Father. After hearing oral arguments of counsel, the court found by clear and convincing evidence that it would be detrimental to E.W. to return her to the parents' care and that the Agency offered and provided the parents with reasonable services. The court ordered that custody continue to be removed and E.W. remain in her current placement, but allowed the parents to move from supervised visits to structured unsupervised visits. Because Mother challenges only the court's finding that the Agency provided her with reasonable services, we focus on the evidence related to that finding.

Mother's case plan required her to participate in a 52-week child abuse group therapy program with an approved provider and complete a parenting education program. Mother completed the parenting program and had an in-home visitation component remaining. She had been attending her group therapy through online sessions facilitated by her therapist, E. Garcia, but at some point before "the end of March," Mother stopped.

On February 26, 2021, Mother told Warner that Garcia was unable to continue providing Mother with online services because Mother now resided in a different state and Garcia was unlicensed there. In late February or early March, Warner tried to reach Garcia to discuss the issue. On March 30, Garcia told Warner she believed she needed to be licensed in Mother's new

6

state of residence to provide her services, that she was in the process of getting that license but the process was "not completed and was complicated." Garcia advised Warner that he "may want to find somebody to provide services" in Mother's new state of residence."[4]

"Within the next two weeks" of Garcia's advice, on April 7, 2021, Warner started the process of locating child abuse classes out of state for Mother. Warner testified: "I started calling in early April the social services up there [in Mother's new state of residence]. I did Internet searches. I consulted with our staff psychologist who helps with mental health services recommendations out of county. I called several agencies that work with families involved with [that state's] child abuse cases, . . . none of them provide the classes in the case plan or anything close to classes for parents of child abuse cases." In total, Warner contacted eight agencies in Mother's new area to find a child abuse class for Mother but none offered a similar child abuse class.

Additionally, Warner made a referral to the health plan in San Diego, Optum, that contracts with service providers for the Agency to request assistance in finding a child abuse class for Mother out of state. Optum responded that child abuse classes were not available in Mother's new area and offered to find her an individual therapist. At the time of the hearing, 32 qualified individual therapists had been contacted on behalf of Mother, of which 22 providers had declined to provide services, nine had not responded,

---

[4]     On July 5, 2021, Garcia informed Warner that she would not be able to complete the process of obtaining a license in Mother's new state of residence. She had applied for the license on January 16, 2021, paid to be fingerprinted, sent her transcripts, and took the license exam twice. However, the process was "too expensive and too complicated [for Garcia] to complete."

and one was still in conversation with Optum about a possible contract to accept the case. Warner testified he believed he had done "everything in [his] power" to obtain services for Mother in her new state, and that his search was "ongoing."

As a result of the difficulty in finding a child abuse class for Mother, the Agency proposed a new case plan in its July 2021 status review report. The new plan omitted the requirement for Mother to participate in a specific group child abuse class and required individual therapy with an approved therapist. The Agency acknowledged the parents' efforts to participate in services, but noted the complication their move out of state created for delivery of such services.

During this time, the parents continued to participate in video visits with E.W. three times each week for about 10 minutes each visit. The Agency also funded two trips for the parents to have supervised visits with E.W. in San Diego in April 2021 and July 2021, paying for their hotel and flights.

Mother requested that the juvenile court find the Agency had not provided her with reasonable services. Counsel for the Agency argued "services do not need to be perfect, they just need to be reasonable under the circumstances" and "clearly the circumstances when the parents leave the state . . . are not ideal." Counsel argued Warner's testimony regarding his efforts demonstrate the Agency was not "sitting on [their] hands" and the Agency had "been working all along in order to try and remedy the situation."

Considering all of the evidence, the juvenile court found by clear and convincing evidence that reasonable services had been offered and provided to Mother to assist her in regaining custody of her child.

DISCUSSION

Mother appeals, contending only that there was no substantial evidence to support the juvenile court's finding that the Agency provided her with reasonable services between the dispositional hearing and the six-month review hearing. "We determine whether substantial evidence supports the [juvenile] court's finding, reviewing the evidence in a light most favorable to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598 (*Katie V.*).) On the record before us and under this deferential standard of review, we conclude substantial evidence supported the court's finding.

"As a general rule, when a child is removed from parental custody under the dependency statutes, the juvenile court is required to provide reunification services pursuant to section 361.5 to 'the child and the child's mother and statutorily presumed father.' (§ 361.5, subd. (a).) The purpose of these reunification services is 'to facilitate the return of a dependent child to parental custody.' " (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281.) Absent an express exemption, reunification services are mandatory, subject to strict timelines, and monitored through periodic court reviews. (*Ibid.*, citing §§ 361.5, 366.21, 366.22.)

" '[T]he focus of reunification services is to remedy those problems which led to the removal of the children.' [Citation.] A reunification plan must be tailored to the particular individual and family, addressing the unique facts of that family. [Citation.] A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where

9

compliance proves difficult.  [Citation.]  However, in most cases more services might have been provided and the services provided are often imperfect.  [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Katie V., supra,* 130 Cal.App.4th at pp. 598–599.)

Here, the juvenile court found by clear and convincing evidence that the Agency offered and provided reasonable services to Mother that were designed to reunify her with E.W.  The court reviewed the reunification plan for Mother and found it was "reasonably fashioned to prevent or eliminate the need for the removal" of the child.  The court emphasized it was not judging "whether the relocation to [out of California] was appropriate or not." It noted "[t]he parents have their own personal reasons for doing so, not the least of which was further family support" and the court declined to "criticize them for that."

However, the court stated that "by the same token, moving to another state creates some extraordinary legal and logistical problems for the Agency in providing services."  The court found that Mother had been engaged in and was making progress with her child abuse group program.  But her therapist was not aware Mother had moved because the sessions were conducted remotely.  When the therapist learned of Mother's move, she was concerned her license "would be in jeopardy" if she provided therapeutic services in a state where she was not licensed.  The court noted the therapist went "so far as to seek licensure" in the new state, "but that did not come to fruition so that further complicated the Agency's efforts."  The court found the social worker and the Agency put in "extraordinary efforts" "to try to land [the parents] services."  Although finding it "unfortunate" Mother's services had

10

been delayed, the court could not "fault the Agency for that delay" given the "practical reality" of Mother's relocation.

Substantial evidence supports the juvenile court's finding. Beginning on the same day as the detention hearing, the Agency offered Mother services specifically designed to remedy the problems that led to removal of E.W. During reunification services, the Agency met its burden to maintain reasonable contact with Mother after she moved out of state, funding two trips for Mother to have in-person visits with E.W. and maintaining regular virtual contact between Mother and child. It undertook significant efforts to find another service provider to address her specific needs when her therapist could no longer provide services. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691 ["[T]he Agency has the burden to maintain reasonable contact with the parent and assist the parent if compliance with his or her case plan proves difficult."].)

Mother relies on this court's decision in *In re M.F.* (2019) 32 Cal.App.5th 1 to argue reasonable services were not provided. This case is not like *In re M.F.*, however, where the Agency only gave a parent a list of therapists but made no reasonable efforts to assist the parent in obtaining access to those services. (*Id.* at pp. 15–16.) Nor is it like *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229 where, because of delays, the Agency provided only two therapy sessions over 15 months and then recommended termination of services. (*Id.* at p. 1244.) Here, the Agency did not abandon Mother when she moved out of state. It actively and promptly tried to obtain alternate services for Mother. Within two weeks of learning Mother's therapist could not continue providing her services because of Mother's relocation, the social worker undertook an extensive search for providers in Mother's new state of residence, including contacting eight agencies in that

11

area for child abuse classes and, through Optum, contacting 32 qualified individual therapists to obtain services for Mother. Although the Agency's efforts had not yet resulted in assignment of a provider at the time of the six-month review hearing, the Agency remained committed to finding an appropriate provider.

We decline to speculate, as Mother suggests, about whether the Agency could have found another provider in San Diego to deliver remote services or whether Mother could have participated in Father's group sessions. In any event, Mother did not raise these issues with the juvenile court and we generally do not consider contentions raised for the first time on appeal. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1528 [argument not raised below is forfeited on appeal]; *In re A.S.* (2018) 28 Cal.App.5th 131, 151 [failure to object to the juvenile court forfeits the issue on appeal].)

Beyond seeking an alternate provider, we note the Agency considered other ways in which Mother could show progress toward her case plan under imperfect circumstances. The Agency modified the case plan to remove the child abuse group program that was previously required and to allow Mother to participate in individual therapy. Warner suggested the parents could show "progress of services" and take a step toward unsupervised visits if they answered questions on their case plans. When Mother told Warner that she had been discussing with Father his child abuse class assignments, Warner identified five out of Father's 23 assignments that were germane to the Agency's assessments of Mother and asked her to provide written responses for that purpose. Mother provided responses the same day.

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) However, "[t]he standard is not

12

whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Ibid.*) Considering the record as a whole, substantial evidence supports the juvenile court's finding that the services were reasonable under the circumstances of this case as of the six-month review hearing.

## DISPOSITION

The August 6, 2021 order is affirmed.

DO, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.

13